IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 7, 2016

**STATE OF TENNESSEE v. JAVONTE THOMAS**

**Appeal from the Criminal Court for Shelby County**
**No. 14-03018     J. Robert Carter, Jr., Judge**

_____

**No. W2015-01473-CCA-R3-CD  -  Filed August 16, 2016**

_____

The defendant, Javonte Thomas, was convicted by a Shelby County Criminal Court jury of first degree premeditated murder and sentenced to life imprisonment. In this appeal, he challenges the sufficiency of the convicting evidence and the trial court's denial of his motion to suppress his statement to police. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Joseph A. McClusky, Memphis, Tennessee, for the appellant, Javonte Thomas.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Eric Christensen and Neal Oldham, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of the February 8, 2014 shooting death of Quintin Fifer, which occurred in the parking lot of a Memphis hotel as the victim was sitting in the driver's seat of his vehicle with his girlfriend, their two-year-old son, and his brother as passengers. A tip led the police to the defendant, whose brother, Jeremy Thomas, had been involved in an earlier dispute with the victim. The defendant was arrested and gave a statement to police admitting that he shot the victim in retaliation for the victim's having earlier shot his brother. According to his statement, the defendant was riding in a

vehicle with his brother and Darius Love when Mr. Love, who was driving, spotted the victim, announced that they had to kill him, and followed the victim's vehicle until it turned into the hotel parking lot. At that point, Mr. Love pulled over at a BP service station and let the defendant out of his vehicle. The defendant followed the victim's vehicle on foot until the victim pulled into a parking spot, shot the victim multiple times, and then ran back to the BP station, where Mr. Love picked him up. The defendant and Darius Love were subsequently indicted together for first degree premeditated and felony murder of the victim. Their cases were later severed, and the State nolle prosequied the felony murder count of the indictment, leaving the defendant to be tried alone for the first degree premeditated murder of the victim.

## Suppression Hearing

Prior to trial, the defendant filed a motion to suppress his statement to police, arguing that it was the product of an illegal arrest, in violation of his Fourth Amendment rights, and was made without the benefit of proper Miranda warnings and as the result of coercive police tactics, in violation of his Fifth Amendment rights. At the suppression hearing, Sergeant Eric Kelly of the Memphis Police Department's Homicide Bureau testified that during the course of his investigation he learned that the defendant had a brother, Jeremy Thomas, who had been shot. He said that Mr. Jeremy Thomas, who contacted the police wanting to talk about the matter, gave them a statement on April 5, 2014, in which he said that the defendant had shot the victim and that he had been present.

Sergeant Kelly testified that police officers located the defendant at his home on April 7 and that he joined them there approximately fifteen or twenty minutes later. He and his fellow officers informed the defendant what was happening and allowed him to smoke a cigarette before handcuffing him and placing him in a patrol car for transport to the homicide office. At the homicide office, Sergeant Kelly again explained to the defendant what was happening before advising him of his rights. He said he followed his usual procedure of giving the defendant the advice of rights form and having him read it aloud, with pauses after each sentence for Sergeant Kelly to ask whether the defendant understood what he had just read. According to Sergeant Kelly, the defendant's only problem was the word "coercion," which he was unable to properly pronounce. Sergeant Kelly testified that he asked the defendant if he knew the meaning of the word and then explained its meaning to him as follows: "I said that means that I get you up here that I beat you, that I kick you, have I threatened you with anything and he says no, and then he signed the form."

Sergeant Kelly testified that after the defendant signed the advice of rights form, he "was surprisingly calm and forthright and immediately went to talking about the

circumstances of the situation that happened." The defendant's statement, which "was precisely in line with" his brother's statement, was reduced to writing and presented to the defendant for his review. The defendant read the statement, made handwritten corrections, initialed each page, and signed at the end. Sergeant Kelly began the process of reading the defendant his rights at 3:56 p.m., and the defendant signed the waiver at 4:01 p.m. and the completed statement at 5:48 p.m. The defendant was offered a soft drink and bathroom breaks during the time he was in the homicide office and was not threatened or promised anything in exchange for the statement.

On cross-examination, Sergeant Kelly estimated that the defendant was arrested around noon and brought to the homicide office before 1:00 p.m. He said that during the interval before the interview began, he checked on the defendant to see if he needed to use the bathroom or wanted anything to drink. During the interval between the defendant's signing of the waiver and the completed statement, the defendant made the statement, the statement was reduced to writing, and the defendant reviewed the written statement and made his handwritten changes.

Sergeant Kelly acknowledged that the defendant told him that he took special education classes. He said that fact did not indicate to him that the defendant had any mental impairment, but instead only a learning disability. He further acknowledged that he purposefully arrested the defendant without a warrant as part of his "investigative technique." He explained: "It was just an aspect of an investigative technique where we like to try to speak with them before a warrant is actually placed on him. A lot of people feel that once a warrant is placed on them that it's over with."

At the conclusion of the hearing, the trial court overruled the motion to suppress, finding that the sergeant had probable cause to arrest the defendant without a warrant and that the three-hour delay between the defendant's arrival at the homicide office and the start of the interview, and the fifty-six-minute delay between the time the defendant signed his waiver of rights and the statement, were insufficient to overcome the defendant's will.

## Trial

The State's first witness at trial was the victim's girlfriend, Airelle Strahan, who testified as follows: At approximately 3:00 or 4:00 p.m. on February 8, 2014, she, the victim, their two-year-old son, and the victim's brother, Jeremy Gray, drove to the Deluxe Inn on Lamar Avenue to rent a room. After paying for the room, the victim returned to their car and began driving around the building to their assigned room. She was in the front passenger seat, their child was in the rear passenger seat behind the victim, and Mr. Gray was in the rear passenger seat behind her. The victim pulled up to a

parking space, and they were all about to get out of the vehicle when a gunshot sounded and the victim grabbed himself and swore. At that point, the driver's door of the vehicle was pulled open and shots began "coming back to back."

Ms. Strahan testified that Mr. Gray fled from the passenger side of the vehicle and that she panicked and fled after him, leaving her child behind in the vehicle. She estimated that she heard as many as twelve gunshots and said that all she saw of the shooter was his hood and the top of his head. She stated that she did not know the defendant. She did, however, know of the defendant's brother, Jeremy Thomas, because the victim had told her about an altercation he had had with him. She also knew Jamal Mister, another man with whom the victim had had an altercation.

The victim's brother, Jeremy Gray, testified that he was unbuckling his nephew from his car seat when he saw a "brown skin[ned]" man wearing a red "hoodie" standing at the driver's door staring at the victim. As the victim looked back at the man, the man first shot the victim through his car window and then opened the door and shot him multiple additional times. Mr. Gray testified that he got out of the car and fled to the nearest neighborhood, where he knocked on doors until someone finally came outside and called the police.

Mr. Gray testified that the shooter fired thirteen shots. He said he did not know the defendant and had never seen him. He stated that he informed the police about two men with whom the victim had had altercations -- Jamal Mister, with whom the victim had argued almost a year before the victim's death, and Jeremy Thomas, with whom the victim had had a confrontation outside a store sometime "close to October." He related that the confrontation with Jeremy Thomas occurred when Mr. Thomas pulled up to the store and the victim pointed him out to Mr. Gray, who was in the victim's vehicle with the victim and the victim's young son. According to Mr. Gray, Mr. Thomas, who appeared very angry, approached the victim's car and "[went] off on [the victim]," pointing his finger in his face and cursing him. Mr. Gray testified that the victim responded by asking Mr. Thomas what his problem was and telling him that he had nothing against him.

Mr. Gray identified a photographic array from which he had picked Jamal Mister as the man who had shot the victim. He explained that he had not gotten a good look at the shooter and identified Mr. Mister because everything happened "so fast" and Mr. Mister was "the only person [he] could think of at the time." On cross-examination, Mr. Gray acknowledged that he also mentioned to the police a man named Derek Fifer, a purported cousin whom the victim had met on Facebook and who had stolen from the victim a .40 caliber Smith and Wesson pistol that looked very similar to the murder

4

weapon. On redirect examination, Mr. Gray testified that, to his knowledge, the victim did not know the defendant.

Memphis Police Officer Antoine Smith, the first officer on the scene, testified that the unresponsive victim was in the passenger seat of the vehicle with multiple gunshot wounds while a one- to two-year-old child was in the rear seat of the vehicle. After securing the child, he maintained the crime scene and searched for witnesses or videotape of the incident. He testified that he located and watched the hotel's surveillance tape, which "show[ed] pretty much the whole incident."

Memphis Police Officer Christopher Slaughter, a crime scene investigator, identified numerous photographs and a sketch he had made of the crime scene. He testified that he collected twelve .40 caliber shell casings, one bullet, and one bullet fragment from the scene.

Memphis Police Officer Jason Parish, the crime scene investigator who processed the victim's vehicle, identified numerous photographs of the vehicle, including ones showing a broken driver's side window, a broken windshield, and three spent bullets he collected from inside the vehicle.

Vijay Patel, who was an employee of the hotel on the day of the shooting, identified a copy of the hotel's surveillance videotape from February 8, 2014, which he provided to the police.

Salem Mohammed, an employee of the Lamar Avenue BP station located across the street from the hotel, identified the station's February 8, 2014 surveillance videotape, which he provided to the police.

Sergeant Eric Kelly of the Memphis Police Department's Homicide Bureau testified that a tip led police to the vehicle involved in the shooting and its driver, Darius Love. He said Mr. Love gave a statement identifying one young man as the shooter, but they were able to quickly eliminate that individual and he was never even brought in for questioning. They next received information identifying Jamal Mister as the shooter, and Mr. Mister was charged with the crime. Eventually, however, they received information that cleared Mr. Mister. Finally, the defendant was developed as the third shooting suspect in the case.

Sergeant Kelly testified that approximately two months after the shooting, the defendant gave a statement admitting his role in the crime. He identified the defendant's April 7, 2014 written statement, which was admitted into evidence and published to the jury. The defendant's statement reads in pertinent part:

5

I was in a black Nissan Altima with Darius Love and my brother Jeramy [sic] Thomas. We was leaving out of the Stonehinge [A]partments where my cousin Yashika lives. We had gone over there to serve her some weed. When we was coming out of the apartment Darius Love spotted [the victim] driving and said, "There go the Quintin nigga." Then he said "we got to kill him." Then he turned the car around and we followed him down Winchester Street. [The victim] turned on Lamar and went to the hotel. Darius pulled over onto the BP store lot and I got out of the car and walked across the street towards the hotel. I followed [the victim] around the parking lot and then he pulled into a parking space. I went up to the car and shot through the window. I opened the door to the car and I kept shooting then I ran from the hotel and the black Altima was riding past and pulled back up to the BP lot and I went and got in. We drove off.

In the statement, the defendant also related that he had been armed with a .40 caliber Smith and Wesson, which he had borrowed from "Psycho" or Theoditis Pitchford; that he had emptied all but one round from the clip shooting at the victim; that he had shot the victim because the victim had earlier shot his brother, Jeremy Thomas; and that he had returned the murder weapon to Theoditis Pitchford after the shooting. The defendant also told police that he held the rank of "Y.G.," or "young gangster," in the 9 Deuce Eastside Bishop gang and that he did not know or recognize the victim until Mr. Love identified him.

Sergeant Kelly identified the surveillance tapes from the hotel and the BP station, which were played for the jury as Sergeant Kelly narrated the action. On cross-examination, Sergeant Kelly acknowledged that the videotapes showed that Darius Love appeared to be keeping an eye on the defendant's actions after letting him out of his vehicle. He further acknowledged that, according to the defendant's statement, it was Mr. Love who followed the victim's vehicle, who pointed the victim out to the defendant, and who stated that they had to kill the victim.

Dr. Miguel Laboy, the medical examiner who autopsied the victim's body, testified that he found a total of sixteen gunshot wounds on the victim. He said the cause of death was multiple gunshot wounds and the manner of death was homicide.

Memphis Police Officer Jerry Knowlton testified that on October 19, 2013, he responded to an aggravated assault call in which Jeremy Thomas, who had a wound to his right calf, reported that he had been shot by the victim.

Detective Dexter Craig of the Memphis Police Department testified that he was assigned the aggravated assault case involving Jeremy Thomas but that Mr. Thomas refused to prosecute. However, when he asked Mr. Thomas to sign a refusal to prosecute form, Mr. Thomas responded that he did not want to sign anything and that he was "straight."

Memphis Police Officer Douglas Gailey testified that he responded to an active shooter call at the Oak Court Mall on March 6, 2014, and made contact with a vehicle involved in the shooting. A pistol was visible in the backseat of the vehicle, which contained four occupants: Frederick Ware, Dewan Avant, Devarious Foster, and Christy Bowen.

Memphis Police Officer Adam Pickering, the crime scene investigator who processed the vehicle associated with the Oak Court Mall shooting, testified that he found two firearms inside the vehicle, including a Smith and Wesson pistol. He identified the .40 caliber pistol, which was admitted as a trial exhibit.

Sergeant Shawn Hicks of the Memphis Police Department's Tillman General Investigation Division testified that the victim of the Oak Court Mall shooting was Theoditis Pitchford, an associate of the four occupants of the vehicle, and that he would have left with them in the vehicle had he not been shot.

Tennessee Bureau of Investigation Special Agent Forensic Scientist Cervinia Braswell, an expert in firearms identification, testified that the twelve cartridge casings, the bullet, and the bullet jacket recovered from the crime scene had all been fired from the Smith and Wesson .40 caliber pistol. She also determined that the three bullets recovered during the processing of the victim's vehicle were fired from the same pistol. A bullet core, which had been removed from the victim's body during the autopsy, bore "no markings of comparison value," and she was unable to make any determinations regarding its origin.

The defendant elected not to testify and rested his case without presenting any proof. Following deliberations, the jury convicted him of first degree premeditated murder, and the trial court sentenced him to life imprisonment.

## ANALYSIS

### I. Denial of Motion to Suppress Statement

The defendant contends that the trial court erred in denying his motion to suppress his statement. Specifically, he argues that his warrantless arrest was unconstitutional

under the Fourth Amendment, asserting that Sergeant Kelly's "especially egregious tactic" of purposefully not seeking an arrest warrant in order to increase the likelihood of obtaining an incriminating statement, "should not be a valid exception to the warrant requirement of the Fourth Amendment." He further argues that the statement was taken in violation of his Fifth Amendment right against self-incrimination, arguing that it was "a direct result of psychological coercion while in a vulnerable state." In support of the involuntariness of his statement, he cites the fact that he attended special education classes in school, does not have a high level of intelligence, was unaccustomed to police interrogation, and was left for hours in "solitude" during the course of the interrogation.

When this court reviews a trial court's ruling on a motion to suppress, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures. See U.S. Const. Amend. IV; Tenn. Const. art. I, § 7. "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" Keith, 978 S.W.2d at 865 (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)). A search or seizure conducted without a warrant is presumed unreasonable, and evidence obtained as a result will be suppressed "unless the prosecution demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement." Keith, 978 S.W.2d at 865 (citations omitted).

One of the exceptions to the warrantless arrest of an individual is when an officer has probable cause for believing that the person has committed a felony. See Tenn. Code Ann. § 40-7-103(a)(3); State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012) (citing State v. Hanning, 296 S.W.3d 44, 48 (Tenn. 2009)). "Probable cause . . . exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" Echols, 382 S.W.3d at 277-78 (quoting State v. Bridges, 963 S.W.2d 487, 491 (Tenn. 1997)).

8

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily given, after the defendant's knowing waiver of his constitutional right to remain silent and to have an attorney present during questioning. See Miranda v. Arizona, 384 U.S. 436, 444 (1966).

Under the Fifth Amendment, a confession is involuntary when it is the result of coercive action on the part of the State. Colorado v. Connelly, 479 U.S. 157, 163-64 (1986). Our supreme court has concluded that "the test of voluntariness for confessions under Article 1, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992). In order for a confession to be considered voluntary in Tennessee, it must not be the result of "'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). Courts look to the totality of the circumstances to determine whether a confession is voluntary. State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996).

In denying the defendant's motion to suppress his statement, the trial court found that Sergeant Kelly had probable cause to arrest the defendant without a warrant and that the delays in the interview process were insufficient to overcome the defendant's will and cause him to make a statement that he otherwise would not have made. The record supports these determinations. Whether or not Sergeant Kelly chose to use the "investigative technique" of not first seeking an arrest warrant does not change the fact that he had probable cause, which included his knowledge of Jeremy Thomas' statement implicating the defendant in the crime, at the time of the warrantless arrest.

As for the defendant's claim that he was coerced into making the statement by his hours in solitude and his vulnerable mental state, we note that Sergeant Kelly's testimony, which was implicitly accredited by the trial court, was that he periodically checked on the defendant during the time he was alone in the interview room, that the defendant was "calm," "forthright" and unhesitant in his statement, that the defendant was not promised or threatened anything in exchange for his statement, and that the defendant did not appear to have any mental disability. We further note that the defendant is able to read and write and indicated on the waiver of rights form that his highest level of education was the twelfth grade. In sum, there was no evidence that the

9

defendant's statement was the fruit of an illegal arrest or was not voluntarily and knowingly made after the defendant was properly advised of his rights and executed a valid waiver of those rights. Accordingly, we conclude that the trial court properly denied the defendant's motion to suppress his statement to police.

## II. Sufficiency of the Evidence

The defendant also contends that the evidence is insufficient to sustain his conviction for premeditated first degree murder, arguing that the evidence, at most, supports only a conviction for voluntary manslaughter. In support, he cites, among other things, the fact that Mr. Love pointed out the victim, announced the intention to kill the victim, and monitored the defendant's actions during the shooting. The defendant argues that he was "used by his brother and [Mr. Love]," who "worked [him] into a frenzy" in order to have him kill the victim, a man he did not know and had no reason to harm. The State argues that the evidence was more than sufficient to sustain the jury's verdict, and we agree.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ( "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

10

Bolin v. State, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To sustain the conviction, the State had to prove beyond a reasonable doubt that the defendant committed a first degree premeditated and intentional killing of the victim. See Tenn. Code Ann. § 39-13-202(a)(1). "Premeditation" is

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

Whether premeditation exists in any particular case is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Our supreme court has listed a number of factors which, if present, may support the jury's inference of premeditation. Among these are the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); Bland, 958 S.W.2d at 660.

Viewed in the light most favorable to the State, the evidence established that the defendant, whose brother had apparently been shot by the victim during an earlier altercation, was riding in a car with his brother and Mr. Love when Mr. Love and his

brother spotted the victim and Mr. Love saw the opportunity of exacting revenge by killing the victim. The evidence further established that the defendant, armed with a borrowed weapon, got out of the vehicle when Mr. Love pulled over at the service station, followed the victim's vehicle, approached the driver's side door, and fired multiple shots at the defenseless victim before fleeing the scene and later returning the weapon to the person from whom it was borrowed. This evidence is more than sufficient to support a finding that the shooting was premeditated. We conclude, therefore, that the evidence is sufficient to sustain the defendant's conviction for first degree premeditated murder.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE